**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| TAMELA FUTRELL, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>MILAN LASER CORPORATE LLC,<br><br>    Defendant. | Case No.: 1:26-cv-2040<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Tamela Futrell ("Plaintiff"), on behalf of herself and all others similarly situated (the "Class Members"), asserts the following against Defendant Milan Laser Corporate LLC ("Defendant"), based upon personal knowledge and, where applicable, on information and belief through the investigation of counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all persons who have accessed milanlaser.com (the "Website") and booked a free consult or appointment for laser hair removal services.

2.      Defendant provides laser fair removal services to consumers through the Website. To book a free consult or appointment on the Website, users must share personally identifying information. When consumers provide this information, they expect that such confidential information and their Website activity will be protected and not disclosed to unknown third parties.

3.      Laser hair removal services are inherently sensitive due to the personal nature of the services provides. Despite reasonable expectations of privacy, Defendant discloses

1

information provided by consumers on the Website to undisclosed third parties, including Meta Platforms, Inc. ("Meta" or "Facebook") and Google, LLC ("Google") (collectively, the "Third Parties").

4.      Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq*. ("ECPA"), the Maryland Wiretapping and Electronic Surveillance Act, Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq*., intrusion upon seclusion/invasion of privacy, and was unjustly enriched by disclosing Plaintiff's and Class Members' private and confidential information without consent.

5.      Defendant chose to implement tracking technologies from Meta and Google, (collectively, the "Tracking Technologies")[1] on its Website, which functioned to intercept and disclose private user interactions on the Website to Meta, in real time, including confidential appointment-booking details and personally identifiable information ("PII") from Plaintiff and Class Members.

**PARTIES**

6.      Plaintiff is a resident and citizen of Gwynn Oak, Maryland. On or around November 2025, Plaintiff booked a laser hair removal appointment through the Website.  Plaintiff booked the appointment through the Website using the same device and browser used to access her Facebook account. When creating her Facebook account, Plaintiff provided certain information to Meta, including her full name. Unbeknownst to Plaintiff, Defendant disclosed her personally identifiable information ("PII") to Meta—including her confidential communications with the Website. Neither Defendant nor Meta procured Plaintiff's prior consent to the sharing of her private

---

[1] Defendant also implemented tracking technology on the Website from LiveRamp, TikTok, Pinterest, and Reddit, among others, which function in substantially similar matters to the Tracking Technologies discussed herein.

information.

7. Defendant Milan Laser Corporate LLC is a Nebraska Limited Liability Company with its principal place of business in Omaha, Nebraska. Defendant is a provider of laser hair removal services throughout the country, including 9 locations within Maryland. Defendant chose to embed the Meta Tracking Technologies on its Website, which it owns and operates.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

9. This Court has personal jurisdiction over the parties because Plaintiff resides in Maryland. Further, Defendant has, at all times relevant hereto, systematically and continually conducted business in Maryland, including within this District, and intentionally availed itself of the benefits and privileges of the Maryland consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout Maryland. Additionally, Plaintiff, while in Maryland, booked a laser hair removal appointment through Defendant's Website.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District.

## FACTUAL BACKGROUND

I.      The Maryland Wiretap Act and the ECPA

11.     Maryland's Wiretap Act prohibits: (a) the interception or procurement of another to intercept any wire, electronic or oral communication; (b) the intentional disclosure of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and (c) the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication.  Md. Code, Cts. & Jud. Proc. § 10-402.

12.     "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  Md. Cts. & Jud. Proc. Code § 10-401(10).

13.     "Contents" is defined as "used with respect to any wire, electronic or oral communication, includes any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication."  Md. Cts. & Jud. Proc. Code § 10-401(4).

14.     "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation."  Md. Cts. & Jud. Proc. Code § 10-401(14).

15.     "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system."  Md. Cts. & Jud. Proc. Code § 10-401(5)(i).

16.     The Maryland Wiretap Act applies unless "*all* of the parties to the communication have given prior consent." Md. Code, Cts. & Jud. Proc. § 10-402 (emphasis added).

17.     Any person who intercepts, discloses, or uses or procures any other person to

intercept, disclose or use, a wire, electronic, or oral communication in violation of the Maryland's Wiretap Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. Md. Code, Cts. & Jud. Proc. § 10-410.

18.    The ECPA and the Maryland Wiretap largely mirror one another with one key distinction: the Maryland Wiretap Act is an all-party consent statute, whereas the ECPA is a one-party consent statute.

19.    Although the ECPA does not apply "where one of the parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[2]

## II.    Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy

20.    "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[3]

21.    "The value of consumer data often comes from identifying users and combining their data from various sources.  This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data.  The ability to identify users enables website and app

---

[2] 18 U.S.C. § 2511(d)

[3] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

operators to combine data and track user activity across devices."[4]

22.    "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user.  Advertisers might expect more precise targeting to increase sales.  Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad."[5]

23.    With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy – but two-thirds either don't know or are misinformed about how their data is being used and who has access to their privacy"[6]
- "67% of respondents don't understand what data privacy means or how their data is being used"[7]
- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[8]
- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [9]
- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%).[10]
- 81% say they feel very or somewhat concerned with how companies use the data

---

[4] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[5] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

[6] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023), https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[7] *Id.*

[8] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[9] *Id.*

[10] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

they collect about them. [11]

- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[12]
- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[13]
- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what actions they can take (25%), and think hackers can access their data no matter what they do (21%).[14]

24.     This concern over data privacy also impacts consumer behavior:

- 79% of Americans are concerned about how companies use their data.[15]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge. [16]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[17]
- 52% of American users chose not to use a product or service due to worries about how much personal data would be collected about them.[18]

---

[11] *Id.*

[12] *Id.*

[13] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children,* KINETIC, (Jan. 24, 2025), https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

[14] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024), https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

[15] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019). https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[16] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025), https://legaljobs.io/blog/privacy-statistics.

[17] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

[18] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

- 48% of users have stopped buying from a company over privacy concerns.[19]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[20]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[21]

25.     Defendant is aware of these privacy concerns, which is why it represents the tracking technology embedded on its website "do not store directly personal information."

**Figure 1:**



26.     Such representations are false.

## III.   Defendant Discloses Consumers' Private Information Through Meta's Tracking Technologies

### A.     Function of the Tracking Technologies

27.      Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such

---

[19] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[20] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[21] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

28.     Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

29.     Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

> ▪ HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

> ▪ Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

> ▪ HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request.  HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

30.     A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

31.     Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

32.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

33.     The Google Tracking Technologies embedded and configured on the Website by Defendant constitute Source Code.

**B.      Meta's Tracking Technologies**

34.      Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, [22] bringing in an excess of $160 billion in 2024.[23]

35.     Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads." [24]

36.     Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 3 billion active users. [25]

37.     Meta's advertising business has been extremely successful due, in large part, to

---

[22] Emmanuel Oyedegi, *Meta's ad business generated 98% of its total revenue in Q2 2025*, TECHLOY (Jul. 31, 2025) https://www.techloy.com/metas-ad-business-generated-98-percent-of-its-total-revenue-in-q2-2025/.

[23] Stacy Jo Dixon, *Meta's ad business generated 98% of its total revenue in Q2 2025*, STATISTA (Jan. 30, 2025) https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_u Q_https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_u Q_

[24] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[25] Naveen Kumar, *Facebook Users Statistics (2025) – Latest Worldwide Data*, DEMANDSAGE (Aug. 19, 2015) https://www.demandsage.com/facebook-statistics/.

Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" [26]

38.     Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements:[27]

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

39.     One of Meta's most powerful advertising tools is the Meta Pixel, formerly known as the Facebook Pixel, which launched in 2015 and its SDK.

40.     Meta touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its]

---

[26] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (Apr. 11, 2018) https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.
[27] *Facebook Ad Revenue (2017–2027),* OBERLO, https://www.oberlo.com/statistics/facebook-ad-revenue.

advertising by understanding the action people take on [its] website."[28]

41.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

42.     Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

43.     This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

44.     For example, Meta uses cookies named c_user, datr, fr and fbp to identify its account holders.  Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

45.     The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

---

[28] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

46.     The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one—and only one—unique c_user cookie.  Facebook uses the c_user cookie to record user activities and communications.

47.     A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details.  Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile.  To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

48.     The Facebook datr cookie identifies the User's web browser.  It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

49.     The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

50.     A User who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to Facebook.

51.     At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

52.     Defendant intentionally configured Meta's tracking technology installed on the Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and

phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to the shopping and products sought from Defendant).

53.    Meta can also link the data to a specific user through the "Facebook Cookie."  The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

54.    Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching."  There are two forms of Advanced Matching: manual matching and automatic matching.  Using Manual Advanced Matching the website developer manually sends data to Meta to link users.  Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[29]

55.    Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.[30]

56.    At the time Plaintiff used Defendant's Website, she maintained an active social media account on Facebook.  Plaintiff accessed the Defendant's Website from the same device she used to visit Facebook, and Meta associated the data it collected about them from Defendant's Website with Plaintiff's Facebook account and other PII.  Meta was also able to associate this information with her identity by matching hashed identifiers (name, phone, email, and address) to its own records.

---

[29] While Meta purports to "hash" the PII provided by patients, Meta actually uses the hashed format *specifically to link the Meta Pixel data to Facebook profiles*.

[30] Jürgen Graf, *Investigating shadow profiles: The data of others*, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

57.     Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.[31]

58.     Meta's SDK collects three types of App Events.  Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases."  Standard Events are "popular events that Facebook has created for the app."  Custom Events are "events [the app developers] create that are specific to [the] app."[32]

59.     Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads.  For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.[33]

60.     In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

61.     Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

62.     According to leaked internal Meta documents, one employee explained "You pour

---

[31] *Meta App Event Tracking*, META, https://developers.facebook.com/docs/app-events/.

[32] *Meta App Event Tracking: Overview*, META, https://developers.facebook.com/docs/app-events/.https://developers.facebook.com/docs/app-events/overview.

[33] *Audience Network*, META, https://developers.facebook.com/docs/app-events/overview.https://developers.facebook.com/docs/audience-network/.

that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?" [34]

63.    In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation." [35]  Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

64.    Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question. [36]

65.    Defendant uses at least the Meta Pixel on its Website. As a result, Defendant disclosed and Meta intercepted users'—including Plaintiff's—interactions on the Website.  Meta received at least the customer's name, email, location, and appointment information which it could associate with embedded cookies to further associate the information with the customer's profile.

---

[34] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/.
[35] *Id.*
[36] Isober Asher Hamilton, *Senior Facebook engineers say no one at the company knows where your data is kept*, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant, so that Defendant could run advertisements using its services.

66.     Plaintiff did not consent to the interception or disclosure of her data to Meta.

**C.      Google's Tracking Technologies**

67.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars.  Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

68.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." [37]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year.  Google generated an even higher percentage of its total revenues from advertising in prior years:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

69.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data

---

[37] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

points on individuals.

70.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

71.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."[38]

72.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

73.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

74.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms." [39]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps,

---

[38] *About the User-ID feature*, GOOGLE,
https://support.google.com/analytics/answer/3123662#zippy=%2Cin-this-article.
[39] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.

throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[40]

75.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when users are logged into their account portals.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or users) is using to access a website.  The device information intercepted by Google includes the user's operating system, operating system version, browser, language, and screen resolution.

76.     In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the user and Source Code, including Google's tracking technologies.

77.     Thus, Defendant is essentially handing its users a tapped device, and once the Webpage is loaded onto the users' browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for the Defendant and transmits those communications to Google.

78.     Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the

---

[40] *Id.*

data is processed, it is stored on a Google database and cannot be changed.

79.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

80.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

81.    The Website utilizes Google's pixel and SDK.  As a result, Google intercepted users' interactions on the Website, including their PII.  Google received at least "Custom Events" and URLs that disclosed the products purchased by the user.  Google also received additional PII, including but not limited to the users' IP address, device information, and User-IDs by matching IP addresses, device information, and User-IDs it intercepts and linking such information to an individual's specific identity.

82.    For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Website.

83.    Similarly, Google also utilizes the "auid" or "Advertiser User ID," and "guid" or "Globally Unique Identifier," parameters to identify unique users and unique interactions with a website Defendant sent these identifiers with each consumer's "event" data.

84.     In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

85.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked, and can provide a wide variety of data.

86.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[41]

87.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

88.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[42]

89.     Browser-fingerprints are personal identifiers.  Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

90.     As enabled by Defendant, Google collects vast quantities of consumer data through

---

[41] Justin Schuh, *Building A More Private Web*, GOOGLE, https://blog.google/products-and-platforms/products/chrome/building-a-more-private-web/.
[42] *New reliable technique to track web users across browsers*, SCIENCEDAILY, https://www.sciencedaily.com/releases/2017/02/170213131447.htm.

its Tracking Technologies.

91. Due to the vast network of consumer information held by Google, matches the IP addresses, device information, User-IDs, and hashed versions of its account holders phone numbers and email addresses it intercepts and links such information to an individual's specific identity.

92. Google then utilizes such information for its own purposes, such as targeted advertising.

93. Google Analytics also links with Google Ads, allowing the data intercepted through Google Analytics to be utilized for targeted advertising purposes.[43]  Such practices were in effect on the Website for targeted advertising purposes.

94. The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."

95. DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[44]  The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[45]

---

[43] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article.
[44] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google/products/marketingplatform/360/introducing-google-marketing-platform/.
[45] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en.

96.     As relevant here, however, data is still sent from the Website to Google through the DoubleClick API, and app developers like Defendant can then use the Google Marketing Platform to manage the data.

97.     Once integrated into a developer's mobile application, the DoubleClick API allows an app developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising. [46]

98.     Once Defendant intercepts the Website communications through the DoubleClick API and discloses such information to Google (in real time), Google has the capability to use such information for its own purposes.  "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps." [47]

99.     Google also encodes the user's email address, to match it to its own records.

100.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

101.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

102.    In sum, Google uses website communications to: (i) improve its own products and

---

[46] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.
[47] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

103.    Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

104.    Google partners with Defendant in its marketing efforts.  Google's tracking technologies, including Google Analytics, browser fingerprinting, and Google DoubleClick are employed on the Website in the manner described throughout this Complaint.

105.    Plaintiff did not consent to the interception or disclosure of her data to Google. Defendant's disclosure, and Google's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy in violation of the ECPA (18 U.S.C. §2511, *et seq.*), the Maryland Wiretap Act (Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq.*), common law intrusion upon seclusion/invasion of privacy, and unjust enrichment.

**D.    Defendant's Use of the Tracking Technologies**

106.    Pursuant to agreements with third parties, including Meta and Google, Defendant intentionally and voluntarily embedded the Tracking Technologies on the Website.  As illustrated within this section, Defendant unlawfully disclosed personally identifiable information and consumer financial information to Meta and Google through the Tracking Technologies, without customer consent.

107.    The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding user IDs, much like a traditional wiretap.

108.    Thus, Defendant is, in essence, handing its customers a tapped website and, once a

24

webpage is loaded into the user's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Meta and Google, or other third parties.

109.    For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

110.    Third parties—including Meta and Google —offer companies, including Defendant, snippets of code they can install in web browsers of users accessing their services. These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and financial information).

111.    Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, User-IDs, cookie identifiers, device identifiers, etc.) and the "content" of these communications (the buttons, links, pages, and tabs they click, as well as the financial information they put in while seeking financial services from Defendant).

112.    Defendant installs these Tracking Technologies despite its understanding that its consumers' reasonably anticipate their identifiable information to be kept confidential and undisclosed to Third Parties.

113.    When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the appointment booking process. The URLs and page

titles disclose what type of appointment the user is seeking to schedule. For example, when a consumer schedules an appointment, Defendant intercepts and discloses information about the private hair removal service to Google through Google's tracking technology. Google also receives consumers' personally identifiable information, such as their full name, browser fingerprints, phone number, and email address. *See e.g.* Fig. 2.

| tag_exp | 0~115938466~115938469 |
|---|---|
| sid | 1779193432 |
| sct | 2 |
| seg | 0 |
| dl | https%3A%2F%2Fmilanlaser.my.site.com%2Fs%2Fscheduling-consults%3Ffirst_name%3DTina%26last_name%3DSmith%26email%3Dyyy222%2540yahoo.com%26phone%3D%252B19546678899%2600N1L00000F9eBV%3DAnnapolis%26city%3DAnnapolis%26state%3DMD%26updates%3Dtrue%26coupon_code%3D%26_gl%3D1*1779193430969*507192013.1777249439 |
| dt | Scheduling%20-%20Consults |
| _s | 4 |
| tfd | 7263 |

**Figure 2**

114.    Defendant also intercepts discloses the type of hair removal treatment scheduled by the consumer. Fig 3.

| tag_exp | 0~115938466~115938469~116701381~118131810 |
|---------|-------------------------------------------|
| u_w | 2560 |
| u_h | 1441 |
| url | https://milanlaser.com/areas/brazilian |
| rcb | 14 |
| frm | 0 |
| tiba | Brazilian Laser Hair Removal |
| ae | a |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 1289228632.1777249439 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;148.0.7778.96|Google%20Chrome;148.0.7778.96|Not%2FA)Brand;99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| data | event=form_submit |
| rfmt | 3 |
| fmt | 4 |

**Figure 3**

115.    Plaintiff booked an appointment on Defendant's Website in a manner substantially identical to that described throughout.

116.    Defendant also intercepts and discloses consumers' private information through Facebook's tracking technology in a substantially similar manner.

117.    Such disclosures are committed in direct violation of Defendant's privacy representations to consumers.

## CLASS ACTION ALLEGATIONS

118.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

27

**Nationwide Class:** All natural persons in the United States who, during the class period, accessed and used the Website to apply for or manage financial services.

**Maryland Class:** All natural persons in the State of Maryland who, during the class period, accessed and used the Website to apply for or manage financial services.

119. Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

120. The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

121. **Numerosity:** The number of persons within the Classes is substantial and believed to amount to tens of thousands of persons. It is therefore impracticable to join each member of the Classes as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impracticable. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's and the Third Parties' records.

122. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without

reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the ECPA and the Maryland Wiretap Act, whether Defendant committed intrusion upon seclusion and/or invasion of privacy, whether Defendant was unjustly enriched, whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

123.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to the Third Parties through the Tracking Technologies.

124.    **Adequate Representation:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

125.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's

liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511, *et seq.*
### (On Behalf Of The Nationwide Class)

126.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

127.    Plaintiff brings this claim individually and on behalf of members of the Class.

128.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

129.    The ECPA protects both sending and receipt of communications.

130.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

131.    The transmission of Plaintiff's PII and confidential information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

132.    The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

133.    The ECPA defines "contents," when used with respect to electronic

communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

134.   The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

135.   The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5).

    a.   The following instruments constitute "devices" within the meaning of the ECPA:

    b.   The computer codes and programs Defendant and the Third Parties used to track Plaintiff and Class Members communications while they were navigating the Website;

    c.   Plaintiff's and Class Members' browsers;

    d.   Plaintiff's and Class Members' mobile devices;

    e.   Defendant's and the Third Parties' web and ad servers;

    f.   The plan the Defendant and the Third Parties carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

    g.   Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

136.   By utilizing and embedding the Tracking Technologies provided by the Third Parties on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or

procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

137. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the Tracking Technologies provided by the Third Parties on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and confidential information to the Third Parties.

138. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific appointment or consultation they were booking. This confidential information is then monetized for targeted advertising purposes, among other things.

139. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to the Third Parties through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

140. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

141. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state.

142.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Defendant specifically used the tracking technology provided by the Third Parties to track and utilize Plaintiff's and Class Members' PII for financial gain.

143.    Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

144.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to the Third Parties without their knowledge or consent.

145.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), et seq.

146.    As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

### <u>COUNT II</u>
**Violation of the Maryland Wiretapping and Electronic Surveillance Act**
**Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq*.**
**(On Behalf of the Maryland Subclass)**

147.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

148.    Plaintiff brings this claim individually and on behalf of the Maryland Subclass.

149.    Maryland's Wiretapping and Electronic Surveillance Act ("MWESA") makes it

unlawful to: (1) willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (2) willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or (3) willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication."  Md. Cts. & Jud. Proc. Code Sec. 10-402.

150.    Under the MWESA, "willfully" is defined as "an intentional violation or a reckless disregard of a known legal duty."  *Benford v. Am. Broadcasting Co.*, 649 F. Supp. 9, 10 (D. Md. 1986).

151.    "Electronic Communication" is defined as "[a]ny transfer of signals, writings, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system."  Md. Code. Cts. & Jud. Proc. Sec. 10-401(5)(i).

152.    "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  Md. Code Cts. & Jud. Proc. Sec. 10-401(4).

153.    "Contents" is defined as "any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication."  Md. Code Cts. & Jud. Proc. Sec. 10-401(7).

154.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of Maryland's

34

Wiretap Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. Md. Cts. & Jud. Proc. Code § 10-410.

155.    At all relevant times, Defendant procured the Third Parties to track and intercept Plaintiff's and Class members' internet communications while navigating the Website.  They intercepted these communications without authorization and consent from Plaintiff and Class members.

156.    Defendant, when procuring the Third Parties to intercept Plaintiff's communications, intended that the Third Parties learn the meaning of the content the visitor requested.

157.    As alleged above, the Third Parties intercepted Plaintiff's and Maryland Class members' electronic communications, including information that contained sensitive and confidential financial information, including personally identifiable information.

158.    Plaintiff's and Maryland Class members' electronic communications were intercepted in Maryland.

159.    Defendant sought to profit and in fact did profit off the interception of Plaintiff's and the Maryland Class members' electronic communications while intentionally or recklessly disregarding its own legal duty.

160.    The interception of Plaintiff's and Maryland Class members personally identifiable financial information constitutes an invasion of privacy sufficient to confer Article III standing.

161.    Plaintiff and Maryland Class members seek all relief available under Md. Code

Cts. & Jud. Proc. Secs. 10-410(a)(1)–(3), including statutory damages of $100 per day for each day or violation or $1,000, whichever is higher, punitive damages, and reasonable attorneys' fees and costs.

**COUNT III**
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of the Maryland Subclass)**

162.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

163.    Plaintiff brings this claim individually and on behalf of the Maryland Subclass.

164.    Defendant's procurement of the Third Parties to intercept Plaintiff's and Class Members' information about their sensitive financial information constitutes an intentional intrusion upon Plaintiff's and Class Members' privacy, seclusion, and private affairs.  Defendant caused the interception of said information, which was intended to stay private, namely sensitive financial information, without users' consent.

165.    Plaintiff and Class Members had a reasonable expectation of privacy in their personally identifiable information and confidential communications with the Website.  This information is inherently sensitive in nature and protected by law.  Plaintiff and Class Members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

166.    There was no indication provided by Defendant that the Tracking Technologies were embedded on the Website or that it would intercept Plaintiff's and Class Members' sensitive and confidential information when they interacted with the Website.

167.    Plaintiff and Class Members did not consent to, authorize, or know about Defendant's intrusion at the time it occurred.  Accordingly, Plaintiff and Class Members never agreed that Defendant could intercept their data or cause the interception of their data on behalf of

the Third Parties.

168. The surreptitious taking and disclosure of sensitive information, from thousands of individuals, was highly offensive because it violated expectations of privacy that have been established by social norms.

169. Defendant decided to implement the Tracking Technologies on its Website knowing that it was procuring the Third Parties to intercept Plaintiff and Class Members' private communications with the Website. Therefore, Defendant acted intentionally.

170. The offensiveness of this conduct is even more apparent because Defendant's disclosure of this information was conducted in secret in a manner that Plaintiff and Class Members would be unable to detect through the seamless incorporation of the Tracking Technologies, which operates wholly behind the scenes while Plaintiff and Class members were interacting with the Website.

171. Accordingly, Defendant's interception of Plaintiff's and Class members' sensitive financial information would be (and in fact is) highly offensive to a reasonable person.

172. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

173. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

174. Plaintiff and Class Members seek appropriate relief for their injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant because of its intrusions upon Plaintiff's and Class Members' privacy.

175.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

176.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT IV
### Unjust Enrichment
### (On Behalf of the Maryland Subclass)

177.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

178.    Plaintiff brings this claim individually and on behalf of the Maryland Subclass.

179.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of valuable personally identifiable financial information, which Defendant collected from Plaintiff and Class Members under the guise of keeping this information private.  Defendant voluntarily collected, used, and procured the interception of such information for its own gain, including advertisement purposes or sale.  Additionally, Plaintiff and Class Members conferred a benefit upon Defendant in the form of monetary compensation.

180.    Plaintiff and Class Members would not have used Defendant's services, or would have paid less for these services, if they had known Defendant would use and disclose this information.

181.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class Members.

182.    The benefits that Defendant derived from Plaintiff and Class Members rightly

belong to Plaintiff and Class Members. It would be inequitable for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

183. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, respectfully requests that the Court enter an order:

    a. Certifying this case as a Class action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing Plaintiff's counsel as Class counsel;

    b. Declaring that Defendant's conduct, as set out above, violates the laws cited herein;

    c. Awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiff and the Classes in an amount to be determined at trial;

    d. Awarding Plaintiff and the Classes equitable relief including restitution and disgorgement of unlawfully obtained profits;

    e. Awarding Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees;

    f. Awarding Plaintiff and the Classes pre-and post-judgment interest, to the extent allowable;

    g. Awarding such other further injunctive and declaratory relief as is necessary to

protect the interests of Plaintiff and the Classes; and

h.  Awarding such other and further relief as the Court deems reasonable and just.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff, on behalf of herself and the proposed Classes, demands a trial by jury for all of

the claims asserted in this Complaint so triable.

Dated:  May 22, 2026                                        */s/ Nathaniel K. Risch*

**MANN & RISCH, LLC**
Nathaniel K. Risch
Fed. Bar No.: 28764
101 E. Chesapeake Ave., Ste. 403
Towson, MD 21286
Telephone: (410) 929-5145
Facsimile: (410) 307-1007
E-Mail: nate@mannrisch.com

**BURSOR & FISHER, P.A.**
Alec Leslie (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Counsel for Plaintiff*